ESTHER RENTIE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33782. Promulgated January 16, 1931.

*Charles P. Woodbury, Esq.*, for the petitioner.
*L. A. Luce, Esq.*, for the respondent.

OPINION.

LANSDON: This proceeding was instituted for a redetermination of deficiencies in income tax and penalties asserted by the respondent as follows:

| Year | Deficiency | Penalty |
| --- | --- | --- |
| 1921 | $1,361.20 | $340.30 |
| 1922 | 42.39 | 10.60 |
| 1923 | 22.21 | 5.55 |
| 1925 | 29.30 | 7.32 |

The petitioner alleges error on the part of the respondent as follows: (1) In refusing to exempt the income of petitioner, who is a citizen of the Five Civilized Tribes of Indians, received from land allotted to her by the United States; (2) in adding to petitioner's gross income for 1921 the amount of $30,000 received as bonus for an oil and gas lease on her property; (3) in disallowing deductions for alleged expenses amounting to $5,000 in 1921, $2,228.05 in 1922, and $600 in 1925, incurred in securing the release of certain funds belonging to petitioner which were held by the Prairie Oil & Gas Co.; and (4) in refusing to allow deductions for depletion based upon cost plus the value of subsequent discoveries of oil and gas made prior to the execution of the lease to the Prairie Oil & Gas Co.

By an amendment to his answer filed at the hearing the respondent alleges: (1) That if the Board should find that the sums of $5,000 and $2,228.05 claimed as ordinary and necessary business expenses for the respective years 1921 and 1922 are items which are properly

deductible as expenses, then the Board should find that the petitioner is not entitled to any deductions for depletion for those years, and her taxable income should be increased accordingly; (2) that he has allowed depletion deductions for the years 1921 and 1922 amounting to $908 and $1,075, respectively; and (3) that if the items of $5,000 and $2,228.05 are not capitalized the petitioner would not be entitled to depletion deductions based on cost, since these sums represent the sole cost of her royalty interest.

The petitioner is a full-blood Creek Indian and her name appears as such on the New Born Creek Freedman Roll, No. 497.

By "Homestead Deed" dated June 3, 1908, and approved by the Secretary of the Interior on August 12, 1908, the petitioner was granted 40 acres of land in Indian Territory, subject to the following conditions:

Subject, however, to the conditions provided by said Act of Congress and which conditions are that said land shall be nontaxable and inalienable and free from any incumbrance whatever for twenty-one years; and subject, also, to the provisions of said Act of Congress relating to the use, devise and descent of said land after the death of the said ESTHER RENTIE; and subject, also, to all provisions of said Act of Congress relating to appraisement and valuation and to the provisions of the Act of Congress approved June 30, 1902 (Public No. 200).

By separate instrument bearing similar date, which is designated "Allotment Deed" the petitioner was granted 120 acres of land in Indian Territory. The only condition stated in such allotment deed is that the grant shall be "subject, however, to all provisions of said Act of Congress relating to appraisement and valuation and to the provisions of the Act of Congress approved June 30, 1902 (Public No. 200)."

On November 26, 1921, the petitioner attained her majority, and, on that date, executed an oil and gas lease covering the above 160 acres of land to the Prairie Oil & Gas Co., hereinafter sometimes referred to as the Prairie Co., for a consideration of $30,000 and one-eighth of the oil and gas produced from the premises. The respondent has determined that one-fourth of the income received by petitioner from her land represents income from her homestead and is nontaxable. He has included the remaining three-fourths thereof in her gross taxable income and it is that amount for each of the years which the petitioner seeks to have exempted from tax.

The deeds above referred to were issued under authority of the Act of Congress, approved March 1, 1901 (31 Stat. 861), as supplemented by the Act of June 30, 1902 (32 Stat. 500), which is a ratification of agreements negotiated between the Commission of the Five Civilized Tribes and the Creek Tribe of Indians. Section 4 of the original agreement provides:

Allotment for any minor may be selected by his father, mother, or guardian, in the order named, and shall not be sold during his minority. * * *

Section 16 of the supplemental agreement provides:

Lands allotted to citizens shall not in any manner whatever or at any time be encumbered, taken or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of this supplemental agreement, except with the approval of the Secretary of the Interior. Each citizen shall select from his allotment forty acres of land, or a quarter of a quarter section, as a homestead, which shall be and remain nontaxable, inalienable, and free from any incumbrance whatever for twenty-one years from the date of the deed therefor, and a separate deed shall be issued to each allottee for his homestead, in which this condition shall appear.

Section 19 of the Act of Congress, approved April 26, 1906 (34 Stat. 137, 144), provides:

That all lands upon which restrictions are removed shall be subject to taxation, and the other lands shall be exempt from taxation as long as the title remains in the original allottee.

On May 27, 1908, Congress passed an Act providing for the removal of restrictions from part of the lands allotted to citizens of the Five Civilized Tribes. The pertinent provisions of such Act are as follows:

That from and after sixty days from the date of this Act the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: All lands, including homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood including minors shall be free from all restrictions. * * *

*　　*　　*　　*　　*　　*　　*

SEC. 2. That all lands other than homesteads allotted to members of the Five Civilized Tribes from which restrictions have not been removed may be leased by the allottee if an adult, or by guardian or curator under order of the proper probate court if a minor or incompetent, for a period not to exceed five years, without the privilege of renewal: * * *

*　　*　　*　　*　　*　　*　　*

SEC. 4. That all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes: * * *.

The respondent's determination, that all income from the 120 acres of land granted to petitioner by "Allotment Deed" is subject to income tax, is approved.

The petitioner contends that the $30,000 bonus, received from the Prairie Co., was income in 1923 rather than in 1921, as the respondent has determined, since the amount was not available to her until 1923, when the title to her land was cleared. The evidence on this point is rather vague and in certain particulars contradictory. The petitioner's witness, Morgan, who acted as her agent, testified that

$29,000 was deposited to petitioner's credit in a bank at Independence, Kans., in the taxable year, and that a pass book was delivered to her. He testified that $1,000 must have been paid to her at the time of, or prior to, the execution of the lease. Whenever the petitioner wanted money she sent to the Prairie Co. with her pass book and that concern obtained the money for her. Why such procedure was necessary, if it was, is not explained by the evidence. Morgan testified that she had never been to a bank and knew nothing of bank procedure. Small portions of the $29,000 were withdrawn during 1921 and 1922 to defray expenses of defending petitioner in certain incompetency proceedings and suits attacking title to her land. Pending settlement of such litigation the Prairie Co. instructed her not to write any checks on her account, but that if she needed any money she should send her book to it and the amount would be procured and sent to her. The evidence would indicate that the $29,000 was unqualifiedly subject to her demand in the taxable year. It was deposited in a bank to her credit, she had the pass book, and certain amounts were withdrawn for her in 1921 and 1922. We think the respondent's determination should be approved.

In the latter part of 1921, suit was instituted against petitioner, by one Mandler, attacking her title to the 160 acres of land. He exhibited a deed thereto which petitioner alleged was a forgery. Numerous other suits were brought by and against petitioner, some of which sought to have her declared incompetent. Attorneys were employed by her and from time to time attorney fees were paid amounting to $4,218.50 in 1922 and $950 in 1923. Mandler finally secured judgment by default in the suit on the alleged forged deed, and in 1923 petitioner secured a quitclaim deed from him for $5,000. The foregoing amounts are those which petitioner seeks to deduct from income as expense of securing the release of the $30,000 due her by the Prairie Co. The evidence does not sustain such a contention. In so far as the expenditures were made in defense of or to clear petitioner's title to her land, they represent capital transactions which should be added to the cost of the property. The amounts are not deductible as expenses. *Chestnut Farms Dairy, Inc.*, 19 B. T. A. 192, and cases therein cited. In so far as the expenditures represented the defense of suits to have petitioner declared incompetent, which amounts are not disclosed by the evidence, they are personal and are not deductible.

The fourth and last contention of the petitioner is that depletion deductions should be allowed on discovery value, discovery having been made prior to the execution of the lease to the Prairie Co., and that the bonus of $30,000 received for the lease is subject to depletion

based on such value. In support of his contention counsel for the petitioner cites G. C. M. 2824, C. B. VI–2, p. 221, and article 215 of Regulations 62. We need not discuss the applicability of such ruling and regulation, however, since the record contains no basis upon which we could allow the petitioner's claim. The petitioner's witness, Morgan, testified that the property was worth between $55,000 and $60,000 on the date it was leased to the Prairie Co. He testified that " at the time the first well was drilled, had she been 21 years of age, the Prairie that owns that lease to-day would have paid her $125,000 for it." The first wells were drilled some time in 1915 or 1916. The evidence does not disclose the extent of the discovery or the estimated oil reserve established thereby. There is no showing as to the cost of development or that the fair market value at date of discovery was materially disproportionate with such cost, if any. We do not know the amounts of the additional depletion deductions claimed by the petitioner. The respondent's determination must be approved.

*Decision will be entered for the respondent.*